IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-585

No. COA21-149

Filed 2 November 2021

Durham County, No. 20 SPC 50081

IN THE MATTER OF: A.S.

Appeal by respondent from involuntary commitment order entered 20 November 2020 by Judge Pat Evans in Durham County District Court. Heard in the Court of Appeals 6 October 2021.

*Yoder Law PLLC, by Jason Christopher Yoder, for respondent-appellant.*

*Attorney General Joshua H. Stein, by Assistant Attorney General Rachel A. Brunswig, for the State.*

ARROWOOD, Judge.

A.S. ("respondent") appeals from an involuntary commitment order committing him to an inpatient 24-hour facility for a period of thirty days. For the following reasons, we affirm.

I.    Background

On 6 November 2020, Barbara Persinger, respondent's mother, filed an Affidavit and Petition for Involuntary Commitment in Granville County District

Court, which read:

> RESPONDENT IS AGGRESSIVE AND VERBA[L]LY
> ABUSIVE WITH HIS MOTHER AND ACT[T] TE[AM]
> MEMBERS. HE HAD A HAMMER IN HIS PANTS,
> HOWEVER HE DID NOT MAKE ANY MOVEMENTS TO
> USE IT AS A WEAPON. HE IS TALKING IN MULTIPLE
> VOICES. HE HAS PRESCRIBED MEDICATION, BUT
> HIS MOTHER DOES NOT THINK HE IS TAKING IT ON
> A REGULAR BASIS. MOTHER HAS PETITIONED THE
> GRANVILLE COUNTY SYSTEM FOR GUARDIANSHIP
> OF [RESPONDENT] SINCE HIS LAST PETITION.

Respondent was taken into custody on 6 November 2020 and delivered to Duke Regional Hospital ("Duke") in Durham County the next day. After a first-level examination and evaluation were conducted on respondent on 7 November 2020, Doctor Grace C. Thrall ("Dr. Thrall") conducted a second examination on 8 November 2020. After the examination, Dr. Thrall described the following:

> [Respondent] is a 45 y.o. single white male with Brugada syndrome, schizoaffective disorder and past alcohol abuse, complicated by poor insight and medication nonadherence, requiring multiple psychiatric hospitalizations and followed by Carolina Outreach ACTT team. He presents to the D[uke] ED on petition by his mother for worsening psychosis characterized by disorganized thinking, growling speech, paranoia (walking around with a hammer in his pants x 2 days), increased verbal agitation with family and ACTT, and delusions about robots and artificial intelligence. His ACTT team believes he has not been compliant with his antipsychotic medications and is concerned he is not safe in the community, having assaulted his mother in the past when mistaking her for a robot and having taken an ax to most of his furniture and electronics and burned them on his grill.

Dr. Thrall concluded respondent was a danger to himself and others, and

recommended thirty days of inpatient commitment.

¶ 3        An involuntary commitment hearing was held before the Durham County District Court, Judge Evans presiding, on 20 November 2020 to determine the appropriateness of respondent's involuntary commitment. Respondent, respondent's counsel, and Doctor Leslie Bronner ("Dr. Bronner"), a Duke employee who had been treating respondent, were present at the hearing, while neither the State nor Duke had any counsel present. At the outset, respondent's counsel objected to "proceeding without representation" for the State. The trial court overruled the objection and allowed the hearing to move forward. The trial court examined Dr. Bronner. Dr. Bronner testified, in pertinent part, to the following:

> [T]his is a 45-year-old patient with a history of schizoaffective disorder. He has more than 20 psychiatric hospitalizations. He came to Duke . . . due to medication non-compliance. He dismissed his outpatient treatment team. He was verbally abusive towards his mother. He was burning furniture, and so he was brought in for psychiatric evaluation. I saw him on the second day that he had been admitted to the psychiatric ward. I've been working with him daily since then, except for weekends.
>
> Initially he was very irritable and dismissive. He would barely talk to me. If he talked, he would not allow me to speak. He mainly talked about how he was not -- he was sort of blaming people for not allowing him to live on his own. He said that he has been medication compliant. He was dismissive of all of the things that his outpatient treatment team said, as well as his mother. He was medication compliant with his Invega. Initially, however, because of his behaviors, he's had to be sequestered from the rest of the unit. He becomes agitated, he becomes verbally abusive to staff. He starts yelling, he starts

pacing. He is refusing medications to help him calm down,
and so we still have not been able to allow him to interact
with the rest of the ward.

. . . .

And so, because he's not compliant with his oral
medications, . . . he needs to be on a long-acting injectable
medication. I talked to him about that yesterday. He said
that he was not going to do it. He did not need to do it, and
that he was going to take me to court to shut me
up . . . . And so, he continues to need to be hospitalized
because he remains a danger to himself and others.

¶ 4        Throughout this portion of Dr. Bronner's testimony, respondent interrupted
multiple times by, among other things, objecting, arguing against Dr. Bronner's
testimony, asking whether he would have the opportunity to represent himself, and
making references to "stalkers . . . from Raleigh . . . that won't leave me alone."

¶ 5        Once Dr. Bronner was allowed to continue with her testimony, she stated:

Because it's been very difficult to manage his behaviors on
the unit, he remains sequestered from other patients on the
unit. He still needs to be hospitalized for further
medication management and he also needs to be on a long-
acting injectable to prevent further psychiatric
hospitalizations due to medication non-compliance.

When asked whether she believed respondent was a danger to others, Dr. Bronner
replied that she did, and explained, in pertinent part: "He's been agitated and
verbally abusive to the staff and to me, and we're unable to even allow him to interact
with other people on the unit." Dr. Bronner asked that he be committed for thirty
days.

¶ 6        On cross-examination, Dr. Bronner testified that respondent had not made

threats or attempts to harm himself and "ha[d] not physically touched anybody" while at Duke, though "he postures and paces." Regarding respondent's willingness to take his prescribed medication, Dr. Bronner testified: "He's partially compliant. He takes scheduled medication, but when he gets agitated and aggressive towards staff, we want to try to give him other medications to calm him down which he has refused and it just lets me know that he needs more scheduled medication." At this point, respondent interrupted again.[1]

¶ 7        Next, respondent testified as witness. After mentioning his allergy to Lithium, respondent's testimony, in pertinent part, proceeded as follows:

> Q. So, is the reason that you do not want to take some of the as-needed medication, or the long-acting injectable, because you're afraid of allergic reactions?
>
> A. I am scared -- I'm paranoid of the needles. As part of my condition that it's under my belief that there is a robot cybernetic unit, possibly from the International Robo Expo that has manipulated time and uses their plastic injectable disc to write them and lock us in certain discause [sic], where we're punished . . . and our bodies are transported in and out for their amusement and for our punishment, and the needles scare me so bad, I am paranoid schizophrenic and it is because of exactly that injectables [sic].
>
> . . . .
>
> So I don't mind taking the oral alternative. I've been compliant with the oral alternative for over 14 years now.

---

[1] Here, respondent appears to talk about his medication and claims he had been "completely compliant in all cases," though much of his statement is unclear with portions marked in the transcript as indiscernible.

¶ 8        When asked whether he had ever thought about harming himself in the last month, respondent replied: "Absolutely not. I love myself. I don't want to be harmed at all. I love myself, my family. I don't want anybody else to be harmed." When asked whether, while at Duke, he had "thought about harming anyone on the unit[,]" respondent replied: "I have not. I've actually taken note that there -- that black people from harming me [sic]. I even closed off the back corridors of the unit so that they can't get in to harm me." When asked by his counsel if there was anything else he wanted to share, respondent made a long, incoherent statement in which he made references to his paranoia of "the digital age[,]" "transposing time[,]" the mandate of "an unescapable hell[,]" and an "alien cross-communication virus . . . ."

¶ 9        Respondent's counsel asked the trial court to find respondent was not a danger to himself or others, citing respondent's testimony that he did not think about harming himself or others, that he had not made threats or attempts to harm himself, and that he had not touched others. Respondent interrupted throughout. The trial court concluded: "I do find that [respondent] has a mental illness, he's a danger to himself and to others. He's to be recommitted to the 24-hour in-patient facility for a period not to exceed 30 days."

¶ 10       The trial court filed a written Order on the same day. In this Order, the trial court did not check box number four—"by clear, cogent, and convincing evidence, [the trial court] finds as facts all matters set out in the commitment examiner's report specified below, and the report is incorporated by reference as findings." However, in

the designated space below box number four, the trial court provided Dr. Thrall's name—"Dr. Grace Thrall"—and the date of her last report on respondent—"11-18-20[.]" Conversely, the trial court checked box number five, indicating that it found "by clear, cogent, and convincing evidence" "facts supporting involuntary commitment[.]" This was followed by the trial court's handwritten notes:

> Prior to court, [r]espondent insisted Judge recuse herself because unqualified to hear federal matters. He constantly interrupted proceedings; stating he was being stalked. Non-compliant when admitted to hospital and remains medication non-compliant. Has to be sequestered from others on unit because verbally abusive towards staff. Postures and paces. Told Doctor he would take her to court to "shut her up." Dismissed outpatient treatment team. During direct examination, [respondent] babbled about intergalaxial [sic] conspiracies.

Based on these findings, the trial court concluded respondent "has a mental illness" and "is dangerous" to himself and others, and ordered that respondent be committed to Duke for no longer than thirty days.

¶ 11 Defendant filed written notice of appeal on 24 November 2020. Because "[a]n appeal of right lies with this Court from a final judgment of involuntary commitment[,]" this appeal is properly before us. *In re J.C.D.*, 265 N.C. App. 441, 444, 828 S.E.2d 186, 189 (2019) (citations omitted).

## II. Discussion

¶ 12 Respondent contends on appeal that: (A) the trial court violated respondent's due process right to an impartial tribunal because of the absence of a representative

for the State during the hearing, and because the trial court asked questions during witness testimony; and (B) the trial court erred in adopting Dr. Thrall's report.

### A.    Impartial Tribunal

¶ 13    "The due process right to an impartial tribunal raises questions of constitutional law that we review de novo." *In re Q.J.*, 2021-NCCOA-346, ¶ 19 (citing *Dorsey v. UNC-Wilmington*, 122 N.C. App. 58, 66, 468 S.E.2d 557, 562 (1996)). "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." *Id.* (quotation marks omitted) (quoting N.C.R. App. P. Rule 10(a)(1) (2021)). Here, respondent's counsel objected to proceeding without opposing counsel at the outset of the hearing. Thus, the issue has been properly preserved for our review. *See id.*

¶ 14    Respondent argues the trial court violated his right to procedural due process and an impartial tribunal because the involuntary commitment hearing proceeded in the absence of opposing counsel and because the trial court "examined witnesses, became a witness itself for events that occurred before the hearing started, and even entered evidence without informing the respondent or allowing the respondent to object." We disagree.

¶ 15        As this Court has noted, there is no constitutional right to opposing counsel. *Id.* ¶ 21 (quoting *In re Perkins*, 60 N.C. App. 592, 594, 299 S.E.2d 675, 677 (1983)). Additionally, per our statutes:

> [T]he Attorney General may, in his discretion, designate an attorney who is a member of his staff to represent the State's interest at any commitment hearing, rehearing, or supplemental hearing held in a place other than at one of the State's facilities for the mentally ill or the psychiatric service of the University of North Carolina Hospitals at Chapel Hill.

N.C. Gen. Stat. § 122C-268(b) (2019). Thus, here, because respondent was being treated at Duke, a private institution, there is no statutory requirement to have an attorney for the State present at respondent's hearing. *See id.*

¶ 16        Further, for a judge to "preside at an involuntary commitment hearing and also question witnesses at the same proceeding" does not jeopardize a respondent's constitutional rights. *In re Q.J.*, ¶ 21 (quotation marks omitted) (quoting *In re Jackson*, 60 N.C. App. 581, 584, 299 S.E.2d 677, 679 (1983)). In fact, in such instances, "[j]udges do not preside over the courts as moderators, but as essential and active factors or agencies in the due and orderly administration of justice." *Id.* ¶ 22 (alteration in original). Thus, "[i]t is entirely proper, and sometimes necessary, that they ask questions of a witness[.]" *Id.* (citation omitted; second alteration in original). However, at the same time, trial courts cannot conduct themselves in such ways "that could be construed as advocacy for or against either" party. *Id.* ¶ 23.

¶ 17 Here, the trial court's only substantive questions of Dr. Bronner on direct examination were the following:

Q. All right, ma'am, whenever you're ready . . . . Whatever it is you want me to know about why we're here today.

. . . .

Q. All right ma'am. If you could start over slowly for me so I can take notes.

. . . .

Q. He was going to take you to court to what? . . . . Shut you up? Okay.

. . . .

Q. Anything else?

. . . .

Q. All right. You testified that you believe he's a danger to himself. Do you believe he's a danger to others?

. . . .

Q. And what do you base that on?

. . . .

Q. All right. And how long are you asking for?

Similarly, during respondent's testimony, the trial court only stated, "Thank you so much for sharing with me[,]" and, "Thank you for sharing with me, [respondent]."

¶ 18 Here, there is nothing from the transcript that indicates the trial court, while asking questions of witnesses, was advocating or intending to advocate for either party. *See id*. (finding no issue with the trial court when it asked on direct

examination: "All right, ma'am. Tell me what it is you want me to know about this matter"; "Anything else?"; and "I'm sorry. What was the last thing you said?"). Accordingly, the trial court did not violate respondent's due process right to an impartial tribunal by allowing the hearing to proceed without opposing counsel and by asking questions itself. *See id.*

### B.  Adoption of Dr. Thrall's Report and Findings of Fact

¶ 19    Respondent argues the trial court erred in adopting Dr. Thrall's report because it "did not find the report by clear, cogent, and convincing evidence," "the report was entered by the trial court without notice to [respondent] in violation of his right to confront and cross-examine Dr. Thrall[,]" and the report contained inadmissible hearsay.

### 1.  Dr. Thrall's Report

¶ 20    As a preliminary matter, we address the fact that the written Order does not check box number four while simultaneously providing pertinent information below it. Respondent argues that, because the trial court did not move to enter Dr. Thrall's report into evidence during the hearing, or otherwise make any other mention of it prior to the issuance of its Order, it was error for the trial court to refer to it in its written Order. Particularly, respondent argues the trial court "considered the report in making its final determination" without "indicat[ing]" in the written Order "that it was finding all of the facts contained in the examiner's report by clear, cogent, and

convincing evidence"—in other words, without checking box number four. Conversely, the State argues that, precisely because the trial court did not check box number four, the trial court did not incorporate Dr. Thrall's report as findings at all.

¶ 21        "Certified copies of reports and findings of commitment examiners and previous and current medical records are admissible in evidence, but the respondent's right to confront and cross-examine witnesses may not be denied." N.C. Gen. Stat. § 122C-268(f). Throughout respondent's hearing, the trial court did not move to admit Dr. Thrall's report into evidence, and neither Dr. Thrall nor her report were ever mentioned in open court. Additionally, at the conclusion of the hearing, the trial court did not announce that it intended to incorporate Dr. Thrall's report, or any report, when it ordered that respondent be recommitted. *Cf. In re J.C.D.*, 265 N.C. App. at 443, 828 S.E.2d at 189 ("The trial court announced at the conclusion of the hearing . . . it would incorporate by reference as findings in the order the report of Dr. Ijaz and offered by Ms. Motley."). Furthermore, because neither Dr. Thrall nor any other witness were present during the hearing to authenticate the report, any attempt to admit the report into evidence or otherwise incorporate it as findings would have been error. *See* N.C. Gen. Stat. § 122C-268(f).

¶ 22        Thus, here, the Record and the transcript do not reflect that the trial court admitted into evidence Dr. Thrall's report during the hearing—nor do they reflect that the trial court inadvertently failed to check box number four in its written Order. *Cf. State v. Smith*, 188 N.C. App. 842, 845, 656 S.E.2d 695, 696 (2008) (concluding,

where there were inconsistencies between the hearing transcript and the sentencing form, that the transcript clearly indicated "that the trial court simply misread the sentencing form and checked the wrong box[,]" and thus concluding the trial court had committed a clerical error).

This Court has found that a "trial court's checking of a box" by itself "is insufficient to support th[e] determination" that a respondent is a danger to himself or others. *In re J.C.D.*, 265 N.C. App. at 448, 828 S.E.2d at 192 (quotation marks omitted) (quoting *In re Allison*, 216 N.C. App. 297, 300, 715 S.E.2d 912, 915 (2011)); *see also id.* at 447, 828 S.E.2d at 191 ("Merely placing an 'X' in the boxes of the form order has been disapproved repeatedly[.]" (citation and some quotation marks omitted)). By the same logic, we conclude that a written order that, by virtue of not checking the designated box, does not expressly indicate the trial court "by clear, cogent, and convincing evidence[] finds as facts all matters set out" within a report cannot be construed to mean the inverse. *Cf. id.* at 447-48, 828 S.E.2d at 191-92.

Thus, here, because it did not enter Dr. Thrall's report into evidence and did not check box number four in its written Order, the trial court did not incorporate the report as findings in its Order.[2] *See* N.C. Gen. Stat. § 122C-268(f). Because we

___

[2] In this instance, we distinguish this case from our decision in *In re Q.J.*, 2021-NCCOA-346. There, in dicta, the majority opinion described the report at issue as being incorporated as findings, "although the trial court listed the examination [the doctor] completed" without "check[ing] the box expressly incorporating the report as findings of fact." *Id.* ¶ 13. There, the State and the respondent agreed that the doctor's report had been incorporated by reference, and thus the respondent's issues on appeal did not address the propriety of the

determine that the report was not incorporated, the remainder of respondent's arguments regarding the propriety of the trial court's mention of the report on the written Order are no longer properly relevant to our review.

## 2. Findings of Fact

Respondent also argues that, without Dr. Thrall's report, the trial court's remaining findings of fact fail to support the finding that he was dangerous to himself or others. We disagree.

Even if the trial court had actually improperly incorporated Dr. Thrall's report, the hearing testimony and the trial court's findings of fact as listed on the remainder of its written Order, which are not based upon Dr. Thrall's report in any respect, are sufficient to support the involuntary commitment Order.

"It is the role of the trial court to determine whether the evidence of a respondent's mental illness and danger to self or others rises to the level of clear, cogent, and convincing." *In re Q.J.*, ¶ 26 (citation omitted). On appeal, "[t]his Court reviews an involuntary commitment order to determine whether the ultimate findings of fact are supported by the trial court's underlying findings of fact and

---

trial court's written order. *See id.* ¶¶ 14, 30 n. 4. Thus, the majority in *In re Q.J.* did not reach the issue of whether a written order in which box number four is unchecked, but information pertinent to it is provided thereunder, constitutes incorporation. *See id.* ¶ 14. Here, because respondent argues that it was error for the trial court to "consider" Dr. Thrall's report, by writing her name and the date of the report on the written Order, without expressly incorporating the report and without admitting it into evidence, and because the State specifically contends it was not incorporated, we address the issue outright.

whether those underlying findings, in turn, are supported by competent evidence."

*Id.* (citation and quotation marks omitted; alteration in original).

Per our statutes,

> [t]o support an inpatient commitment order, the court shall find by clear, cogent, and convincing evidence that the respondent is mentally ill and dangerous to self . . . or dangerous to others . . . . The court shall record the facts that support its findings.

N.C. Gen. Stat. § 122C-268(j). Additionally,

> the trial court must satisfy two prongs when finding a respondent is a danger to self or others . . . : "A trial court's involuntary commitment of a person cannot be based solely on findings of the individual's history of mental illness or . . . behavior prior to and leading up to the commitment hearing, but must [also] include findings of 'a reasonable probability' of some future harm absent treatment[.]"

*In re Q.J.,* ¶ 25 (citation omitted; last three alterations in original). "Although the trial court need not say the magic words 'reasonable probability of future harm,' it must draw a nexus between past conduct and future danger." *Id.* (citation and some quotations marks omitted).

Here, "[b]ecause we conclude the trial court properly found [r]espondent was a danger to [others], we do not reach the issue of whether he was a danger to [himself]." *See In re C.G.*, 2021-NCCOA-344, ¶ 33.

Our statutes define "danger to others" as follows:

> Within the relevant past, the individual has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another, or has acted in such a way as to create a

substantial risk of serious bodily harm to another, or has engaged in extreme destruction of property; and that there is a reasonable probability that this conduct will be repeated. Previous episodes of dangerousness to others, when applicable, may be considered when determining reasonable probability of future dangerous conduct. Clear, cogent, and convincing evidence that an individual has committed a homicide in the relevant past is prima facie evidence of dangerousness to others.

N.C. Gen. Stat. § 122C-3(11)(b).

In its written Order, the trial court checked box number five, by which it found "by clear, cogent, and convincing evidence" "facts supporting involuntary commitment." The trial court then listed those facts:

> Prior to court, [r]espondent insisted Judge recuse herself because unqualified to hear federal matters. He constantly interrupted proceedings; stating he was being stalked. Non-compliant when admitted to hospital and remains medication non-compliant. Has to be sequestered from others on unit because verbally abusive towards staff. Postures and paces. Told Doctor he would take her to court to "shut her up." Dismissed outpatient treatment team. During direct examination, [respondent] babbled about intergalaxial [sic] conspiracies.

These fact findings are drawn directly from the evidence at respondent's hearing. The trial court heard from Dr. Bronner that respondent had been previously hospitalized, had been medication non-compliant, had burned his furniture, had told Dr. Bronner he would take her to court to "shut her up[,]" was verbally abusive, and had had to be kept separated from other people on his unit due to his behavior and medication non-compliance. Dr. Bronner also stated that, because respondent

remained medication non-compliant, he would have to remain sequestered from others.

The trial court also observed in open court respondent interrupting Dr. Bronner's testimony repeatedly, stating, during his own testimony, he would not take needed medical injections because he was paranoid about needles and robots "punishing" him through needles, stating he had blocked the corridors of his unit to stop people from harming him, and making many other incoherent statements.

Thus, here, the trial court satisfied the two prongs to support an involuntary commitment order because it made findings of respondent's past behavior and findings indicative to his probability of future harm absent treatment. *See In re Q.J.,* ¶ 25. Accordingly, these findings of fact, while cryptic and bare boned, are sufficient to support the issuance of the Order and are supported by the testimony of respondent's treating physician and the actions of respondent at the hearing. Thus, the trial court did not err in finding respondent was a danger to others.

### III.   Conclusion

Accordingly, we affirm the trial court's Order.

AFFIRMED.

Judges DIETZ and HAMPSON concur.